## Case No. 14,854.

UNITED STATES v. COOKE et al.

[4 Ben. 376· [1]   13 Int. Rev. Rec. 4.]

District Court, S. D. New York. Dec., 1870.[2]

COUNTERFEIT TREASURY NOTES—ASSISTANT TREASURER — CIRCUMSTANTIAL EVIDENCE — HONEST BELIEF.

1. The defendants. having presented at the sub-treasury of the United States certain seven-thirty notes of the United States. to be retired under the provisions of the act of April 12th, 1866 (14 Stat. 31). and having received the money therefor, it was afterwards claimed by the government that eighteen of them were counterfeits, and an action of assumpsit was brought by the United States against the defendants. to recover the moneys paid for such alleged counterfeits. *Held*, that, in order to entitle the United States to recover. it .was necessary for them to prove that the eighteen notes were delivered to the United States by the defendants. that the United States paid their money for them. and that they were not issued by the United States under any act of congress.

2. Under the act of April 12th, 1866, the secretary of the treasury had no authority to retire or redeem any notes that were not in fact issued by the United States.

3. Under the provisions of the act of June 30th, 1864 (13 Stat. 218), the imprint, on the notes, of the signatures of the treasurer of the United States and the register of the treasury, and the statement showing the amount of interest accrued or accruing and the character of the notes, spoken of in the act, are to be taken as evidence of the lawful issue of such notes.

4. A delivery of notes to the assistant treasurer of the United States takes place when the notes are delivered to the proper officer. acting under the authority of the assistant treasurer.

5. As to the application of circumstantial evidence. if the jury should find any one circumstance clearly proved, which was inconsistent with a certain theory, that would be sufficient to destroy the theory entirely.

6. The receipt of the notes as genuine, by the assistant treasurer, would not bind the United States in any manner, if the notes were not in fact genuine.

7. The honest belief of the defendants in the genuineness of the notes would not constitute a defence.

[This was an action of debt by the United States against Jay Cooke, William J. Morehead, H. D. Cooke, H. C. Fahnestock, Edward Dodge, and Pitt Cooke, comprising the firm of Jay Cooke & Co., for money had and received by the defendants to and for the use of the United States, which money was received upon the occasion of their delivery to the plaintiff of certain treasury notes, believed by plaintiff to be valid, whereas they were afterwards discovered to be counterfeit.]

BLATCHFORD, District Judge (charging jury). This case, to which· you have given such patient attention for thirteen days, filled, as some parts of it have been, with details not in themselves very interesting, and perhaps rather tedious, is one of the most important cases in which it can be the privilege of any citizen to take part either as judge, prosecuting officer, counsel for the defence. or juror, because it concerns deeply the interests of every man in the community. Every one of us, as a citizen of the United States, has an interest in seeing to it, that this immense mass of debt. which has been created by the government for the protection of our rights, our liberties, and our perpetuity as a nation, shall not be counterfeited, falsely issued, and palmed off upon the community, and even upon the subordinate officers of the government, in redeeming its indebtedness, imposing, in such case, on the government the necessity of resorting to actions, like the present one, for the purpose of recovering what may be its just due. The loss resulting from counterfeit paper of this kind must fall on some one in the community, and almost certainly on some party who is really entirely innocent of any complicity with· the spurious issue. So, on the other hand, every ·citizen dealing, or liable to deal, in spurious articles of this description, is interested that no piece of paper shall be pronounced spurious which is, in reality, genuine. Therefore it is, that this case has been tried with so much care upon the part of the government, with so much patience on the part of the court and jury, and with such assiduous fidelity on the part of the counsel for the defence.

In the remarks which I shall have to make to you, I shall not detain you long. The claim which is made by the government I shall submit to you upon those counts of the declaration, in respect to each one of the eighteen pieces of paper, which are, in substance, to this effect—that, on a certain day named, one thousand dollars, and some additional amount, by way of interest, was obtained by the defendants, Jay Cooke & Co., from the United States. on the occasion of the defendants having delivered to the United States what purported to be a certain obligation of the United States, known as a seven-thirty note, and a coupon attached, for the principal sum of one thousand dollars, and certain interest, to wit, a note bearing seven and thirty one-hundredths per cent. interest per annum, and numbered so and so. of the series of seven-thirty notes issued June 15th, 1865, by the United States, together with an interest coupon, attached to said note, calling for interest to June 15th. 1868, which note, with such coupon attached, was, by the defendants, at the time they delivered it to the officer of the. sub-treasury of the United States, professed to be, and by the plaintiffs was, when received by them, supposed to be, a genuine note of the United States, with a genuine coupon attached; and that, by the representations and inducement of the defendants. then and there practiced, the same was received by the United States, and their said officer, as a valid and genuine

---

[1] [Reported by Robert D. Benedict. Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 3.178. Judgment of circuit court reversed by supreme court in 91 U. S. 389.]

note. with the coupon attached, at the sub-treasury of the United States; whereas, the note and coupon were, in fact, counterfeit, and neither of them had ever been executed or issued by the United States, their officers or agents, but had been forged and falsely made and uttered, and were no obligation whatever of or upon the United States, and were by them, to wit, by their said officer, received, under the belief created by such representations and inducement, that the said note and the coupon attached were good, and formed a valuable and adequate considera-tion for the money received by the defend-ants, which was retained from the plaintiffs after the discovery that the said note and coupon were counterfeit, whereof prompt no-tice was given to the defendants. Then fol-low the usual averments to constitute what is called, in the law, an action of assumpsit.

You will perceive that this declaration as-serts three things, and those three things must every one of them be proven in favor of the United States, to entitle it to recover in this action; for, if any one of the three shall be found by you in favor of the defend-ants, the defendants will be entitled to your verdict. Those three things are these: First, that these eighteen pieces of paper, marked C, and called, throughout this trial, the C notes, are the ones alluded to in the declara-tion, and were delivered to the United States by the defendants; second, that the United States paid their money for them; and, third, that they were not issued by the United States under any act of congress.

The law under which these transactions took place, and of which you have heard so much, in the course of this trial, in con-nection with the redemption, retiring or with-drawal of the notes called seven-thirty notes, is the act of April 12th, 1866 (14 Stat. 31). The words of that act on this subject are very few. It authorizes the secretary of the treas-ury to dispose of any description of bonds authorized by the prior act of March 3d, 1865, "either in the United States or elsewhere, to such an amount, in such manner, and at such rates, as he may think advisable, for lawful money of the United States, or for any treas-ury notes, certificates of indebtedness, or cer-tificates of deposit, or other representatives of value, which have been, or which may be, issued under any act of congress, the proceeds thereof to be used only for retiring treasury notes, or other obligations, issued under any act of congress." This is the simple provi-sion under which the retiring of the seven-thirty notes took place. The authority it con-ferred upon the secretary of the treasury, and the subordinate officers of the treasury department, was solely to retire treasury notes issued under some act of congress. If they were not issued under some act of con-gress, they were not within the lawful powers delegated to the secretary of the treasury by the act of 1866. The entire matter is regu-lated by statute; and, if these notes were in fact not issued under an act of congress, there was no authority on the part of the secretary of the treasury or of any other officer, high or low, not even the president of the United States himself, to retire or redeem them. The law-making power is the omnipotent pow-er, in that respect, under the constitution of the United States; and, congress having de-clared that the only notes which could be re-tired were those issued under an act of con-gress, no other notes could be so retired.

There are two other statutes to which I must refer in this connection. The notes in ques-tion here, both those marked K, and alleged to be genuine, and those marked C, and alleged to be counterfeit, purport to be issued under an act of congress passed March 3d, 1865 (13 Stat. 468). All of the notes, thirty-six in number, the eighteen marked K and the eighteen marked C, bear date June 15th, 1865, and belong to what is known, in the parlance of dealers in government securities, as the second issue of seven-thirty notes. This act of March 3d, 1865, which was the authority for the issue of these notes, if they be genu-ine, contains generally these provisions—that the secretary of the treasury is authorized to borrow so much money, and to issue therefor treasury notes, in such form as he may pre-scribe, redeemable so and so, to be of such and such denominations. interest to be pay-able semi-annually, the rate, when not payable in coin, not to exceed seven and three-tenths per centum per annum, and the rate and char-acter of the interest to be expressed on such bonds or treasury notes. Then it provides that he may dispose of any of these obliga-tions, as he may think advisable, for coin or other lawful money of the United States, or for treasury notes or other obligations issued under any act of congress, and may issue treasury notes authorized by the act in pay-ment for any requisitions for materials or sup-plies for the government. The third section of the act provides, that all the provisions of the act of June 30th, 1864 (which was the act under which the first series of seven-thirty notes was issued), in respect to forms, inscrip-tions, devices, and the printing, attestation. sealing, signing, and counterfeiting thereof. with such others as are applicable, shall ap-ply to the obligations issued under this act of 1865.

This remits us to the third statute to which I shall refer, and that is the act of June 30th, 1864 (13 Stat. 218), in respect to the forms of the notes and the inscriptions and devices on them. This act of 1864 contains the gen-eral provision, that the secretary of the treas-ury may issue these treasury notes, bearing this rate of interest, seven and three-tenths per cent., and that he may dispose of them upon the best terms he can, for lawful money. Then, at the close of the sixth section, occurs a provision, that the treasury notes authorized by the act to be issued by the secretary of the treasury "shall be in such form as the sec-retary shall direct, and shall bear the written

or engraved signatures of the treasurer of the United States and the register of the treasury, and shall have printed upon them such statements, showing the amount of accrued or accruing interest, and the character of the notes, as the secretary of the treasury may prescribe; and shall bear, as a further evidence of lawful issue, the imprint of the seal of the treasury department, to be made under the direction of the secretary of the treasury, as before directed." This provision is made applicable, by the act of 1865, to the sealing and signing of the notes of the second series; and it requires, as a further evidence of the lawful issue of the notes—the genuine notes—those in fact issued—that they shall bear the imprint of the seal of the treasury department, to be made under the direction of the secretary of. the treasury. The use of the expression, "as a further evidence of lawful issue," necessarily intends that what has been just prescribed in respect to the imprint of the signatures of the treasury and the register, and to the statement showing the amount of interest accrued or accruing and the character of the notes, shall be taken as evidence of lawful issue.

On the point of the notes having printed upon them statements showing the amount of interest accrued or accruing, you will recollect that each note was issued with five coupons. The principal was payable in three years; and, the interest being payable semi-annually, five coupons were attached to each note, representing five instalments of interest, while the sixth instalment was to be payable without a coupon, when the principal should be payable, on the presentation of the note.

As I have said to you, there are three questions here involved—first, the reception of the notes marked C, by the government, from Jay Cooke & Co.; second, the payment therefor, by the government, to Jay Cooke & Co.; and third, whether the notes, if they were received from Jay Cooke & Co., had been previously issued by the government. The first two questions I shall treat as one, they having been so treated by the counsel; and that is, whether the transaction alleged took place in fact between the officers of the sub-treasury here, and Jay Cooke & Co., in respect to these notes marked C. On that subject I have no instructions to give you, except to say that it is a simple question of fact for your determination. You have heard the evidence and the discussions of counsel upon that branch of the case. There is no question of law involved in it. It is for the government to satisfy you, by preponderating evidence, that these C notes were, as is claimed in the declaration, received at the sub-treasury here, by the proper officer there, from some person representing Jay Cooke & Co., and were paid for by the United States to some person representing Jay Cooke & Co., in money or other valuable consideration that was the property of the United States, representing the face of the notes and the accrued interest thereon. It

is simply a question of fact, and on that point I charge you, in accordance with the defendants' request, that, in order to entitle the plaintiffs to recover, they must show that the eighteen notes produced on the trial, and marked C 1 to C 18, were the identical notes which were delivered by the defendants to the assistant treasurer of the United States. I charge you, further, that a delivery to the assistant treasurer of the United States takes place, when the notes are delivered to the proper officer acting under the authority of the assistant treasurer.

I am also asked to instruct you, that, in order to entitle the plaintiffs to recover, they must also show that the eighteen notes marked C 1 to C 18, were delivered to the assistant treasurer between the 20th of September and the 9th of October, 1867. The counts in the declaration are to the effect, that the first one of these notes, No. 68,446, was delivered on the 21st of September, and the last one on the 8th of October. Therefore, the dates stated in this request are according to the averments in the declaration, if the notes were ever received at all. There is no evidence on the subject as to when they were received, except as to times between the dates named in the request; but, the government must satisfy you that the declaration is proved, and that the C notes were received between those dates.

I am also requested to charge that, in order to entitle the plaintiffs to recover, they must further prove that the money paid to the defendants for the notes was the money of the United States. That is true.

I shall now pass to the other branch of the case, and that is, whether these C notes were issued by the United States; because, if you find that, in point of fact, these C notes were not issued by the United States, then the plaintiffs are entitled to recover, provided you also find that these C notes are the identical notes delivered to the government by Jay Cooke & Co., and for which the government gave to Jay Cooke & Co. the money alleged in the declaration. As has been remarked by the district attorney, the ultimate question in this case is, not whether the C notes are spurious or genuine, or whether the K notes are spurious or genuine. That is a collateral question, and the whole investigation into the question whether the K notes are genuine, and whether the C notes are spurious, has been gone into as bearing upon the question, whether the C notes were ever issued by the United States.

I shall call your attention to some matters in connection with each branch of the question in regard to the issue of the notes. There is a class of evidence on this subject aside from any comparison between the C notes and the K notes. There is also a class of evidence that arises from a comparison of the C notes with the K notes, in reference to the question whether the two sets of notes were or were not printed from the same

plates; because, it is an argument in the case, urged by the government, and the challenge is accepted by the defence, that, if the C notes are shown to be spurious, and not to have been printed from any plates which the government of the United States used in printing notes which it issued, the presumption arises that the C notes were never issued by the United States.

There are four points of view from which the genuineness or spuriousness of these notes may be considered. The C notes and the K notes are both of them spurious, or the C notes and the K notes are both of them genuine, or the C notes are genuine and the K notes are spurious, or the K notes are genuine and the C notes are spurious. In considering the question, it undoubtedly is of assistance toward arriving at a determination whether one of two things is spurious, to be satisfied first whether the other of the two is genuine. In other words, it will assist you in determining whether or not the C notes are spurious, if you can determine first whether or not the K notes are genuine; because, you may be entirely satisfied that, if the K notes are genuine, the C notes must be spurious. In other words, if you arrive at the conclusion that the K notes are genuine notes, it may follow in your judgment, as a necessary conclusion, that the C notes are spurious. As I have understood the course of the defence, from the evidence and the summing up, the deduction sought to be drawn from the evidence is, that the C notes are genuine notes, and were issued by the United States; but I have not understood the position to be taken by the defendants, that the K notes are spurious notes. It is, however, for you, on the evidence, to pass upon this question.

As I said before, it may be that, if you are satisfied that the K notes are genuine notes, you will conclude that the C notes also cannot be genuine. On this point you will recollect the testimony of Mr. Casilear, when he was first on the stand, and afterwards when the books were produced, showing the commencement of the printing of the second series of notes on the 5th of March, 1865, two days after the passage of the act authorizing their issue. The effect of his testimony, if it is to be believed, is, that these notes of the second series were printed from three plates of four subjects each, plate 1, plate 2, plate 3, each with four subjects, that is, four notes on each plate. For the purpose of illustrating this matter, I have put into a tabular form what is testified to by one of the witnesses in regard to the check letters which he finds on the C notes and the K notes, it being assumed, for the purposes of this table, that the K notes were printed from three plates of four subjects each. The first plate, or plate 1, I throw entirely out of view, because none of the thirty-six notes appear to have been printed on plate 1. Of the K notes, seventeen appear to have been printed from the second plate, and one on the third plate. All of the

C notes appear to have been printed from the second plate. The table shows plate 2 with four notes on it, and plate 3 with only one note on it, and that one the first note at the top of the plate. According to the testimony of the witnesses, the system of check letters adopted and used, was this: The first note on the plate was lettered A, the second B, the third C, and the fourth D. But, with three plates of four notes each, each plate having these four letters, and these alone, on its four several subjects, it would be impossible to tell, from the face of a note, upon which one of the three plates a note with a given check letter was printed. Therefore, for the purpose of enabling it to be told on which one of the three plates a given note was printed, a small A was engraved underneath each one of the four several letters A, B, C, D, on the first plate; a small B was engraved underneath each one of the four several letters A, B, C, D, on the second plate; and a small C was engraved underneath each one of the four several letters A, B, C, D, on the third plate. Locating the eighteen K notes and the eighteen C notes according to their large and small check letters, by the arrangement which I have just explained, it appears that seven of the K notes have the check letter A with a small B under it, and were, therefore, printed from the first subject on the second plate. Four of the K notes have the check letter B with a small B under it, and were printed from the second subject on the second plate. Three of the K notes have the check letter C with a small B under it, and were printed from the third subject on the second plate. Three of the K notes have the check letter D with a small B under it, and were printed from the fourth subject on the second plate. One of the K notes has the check letter A with a small C under it, and was printed from the first subject on the third plate.

I turn now to the C notes. Every one of them has either the check letter A with a small B under it, or the check letter B with a small B under it, there being eleven with A and a small B, and seven with B and a small B. The same system of interpretation that was applied to the K notes shows, that the eleven C notes which have A and a small B were printed from the first subject on second plate, and that the seven C notes which have B and a small B were printed from the second subject on a second plate. But there is nothing to indicate that the plate from which the C notes were printed had upon it any but the two subjects. There is, however, incontrovertible evidence that the K notes must have been printed from a second plate of four subjects, because there are notes marked K, with the several check letters A, B, C, and D, and a small B under each of them, such small B indicating a second plate, and the four large letters A, B, C, and D indicating that such plate had upon it four subjects.

There is another view of this matter, which, to your minds, may corroborate the testimony

of Mr. Casilear, that, in point of fact, these K notes were printed from plates of four subjects each. You will recollect the testimony as to the notes being numbered consecutively in the treasury department. It is a fact, and is shown by this table, that every one of the K notes which was printed from the first subject on a plate bears an odd number, that is, a number terminating with 1, 3, 5, 7, or 9; that every one of the K notes which was printed from the second subject on the plate bears an even number, that is, a number terminating with 0, 2, or 6; that every one of the K notes which was printed from the third subject on the plate bears an odd number, that is, a number terminating with 5 or 7; and that every one of the K notes which was printed from the fourth subject on the plate bears an even number, that is, a number terminating with 2, 4, or 6. Now, it is quite evident, that, if you have a plate of three subjects only, this uniformity in respect to the notes printed from the first and third subjects on the plate bearing always odd numbers, and those printed from the second subject on the plate bearing always even numbers, could not be preserved, in a system of consecutive numbering; because, you would require for each subject, alternately, even and odd numbers. Thus, beginning with number 1 for the first note printed from the first subject on the plate, the second note printed from that subject would be numbered 4, the third note 7, and so on. The notes printed from the second subject would be numbered 2, 5, 8, and so on; and those printed from the third subject would be numbered 3, 6, 9, and so on. These considerations apply to the question as to whether it is possible that the K notes could have been printed otherwise than from plates of four subjects each.

As to the C notes, every one of them which has the check letter A, and thus purports to be printed from the first subject on a second plate, bears, as do the K notes which have the check letter A, an odd number, that is, a number terminating with 1, 3, 5, 7, or 9; while every one of the C notes which has the check letter B, and thus purports to be printed from the second subject on a second plate, bears, as do the K notes which have the check letter B, an even number, that is, a number terminating with 0, 2, 4, or 6. There is, therefore, this similarity between both sets of notes—every note which has the check letter A bears an odd number, and every note which has the check letter B bears an even number. There are none of the C notes which have a check letter C or a check letter D. This shows that none of them purport to have been printed from the third or the fourth subject on a plate.

I shall allude to but one matter connected with each of the two classes of evidence to which I have referred. I shall first speak of a matter which struck my mind with great force, as the evidence in respect to it was given on the trial, but which has not been alluded to by the counsel in summing up. Mr. Casilear testifies to the fact (and it is readily seen by an inspection of the notes themselves) that, on each one of the four K notes which are printed from the second subject on the second plate, namely, K1, K9, K15, and K18, the loop of the letter p in the word "Spinner"—the engraved signature of the treasurer of the United States, which is required by law to be put on the notes—is brought down in such a manner that the dark line of the loop, as it passes through the border composed of stars, goes through the rays of a star, and divides them into two parts; whereas, on each one of the seven K notes which are printed from the first subject on the second plate, namely, K2, K5, K6, K8, K10, K16, and K17, the loop of the letter p in the word "Spinner" does not cut or divide the rays of a star, but, on the contrary, the whole of such rays are clearly visible within the loop. There is a difference, therefore, in the position of the loop of such letter p, with reference to the rays of the star, between the K notes printed from the first subject on the second plate, and the K notes printed from the second subject on the second plate. Mr. Casilear also states, and it is plainly to be seen, that on every one of the eighteen C notes, whether it has the check letter A or the check letter B, the rays of the star are seen entire inside of the loop of such letter p, and are nowhere cut by the loop. It is for you to say what deductions you will draw from these facts, in respect to the question whether the C notes and the K notes were printed from the same plate or set of plates, irrespective of the question as to which of them are of the genuine issue.

On the class of evidence which is directed to a comparison between the two sets of notes—what is to be seen in making such comparison, and what deductions are to be drawn from what is seen, when the facts are presented in a clear and distinct form and collated—I shall allude to but one point. It is one which was commented upon by the district attorney. It has a bearing on the question, which, as I stated, you may decide to determine before approaching the subject of the issuing of the notes—the question as to whether the K notes are or are not genuine; because, if it is established to your satisfaction that the K notes are genuine, you may, perhaps, be led the more quickly to the solution of the question as to the genuineness of the C notes.

It is testified, and the evidence is not contradicted, that every one of the K notes had appended to it, and forming a part of it, when it was issued by the treasury department, the five coupons to which your attention has been called, and that the coupons on each note were numbered severally 1, 2, 3, 4, 5 (and so numbered that number 1 should be cut off first, and the rest in suc-

cession, and number 5 last), and that each coupon was also numbered with the number of the note. The government has produced here, from the files of the department, the K notes which correspond in numbers with the C notes, and, in every case where any K note has not now attached to it coupons which formed an integral part of it when it was issued, the government has produced from the same files certain coupons which, it claims, make up, with the coupon or coupons now attached to the note, all the five coupons which ever belonged to it. One of the K notes has yet attached to it two coupons, others of the K notes have but one coupon attached, and still others have no coupon attached. Here are the notes and here are the coupons so produced—single coupons corresponding in numbers with the K notes and without duplicates; and it is testified that no duplicate coupons could be found, on searching, in the place where these coupons were found. Every one of the C notes produced has upon it the coupon numbered 5, and no one of the C notes has upon it any other coupon. The loose coupons so produced must be applied to the one or the other of these sets of notes, if they belong to the one or the other. Some loose coupons numbered 5 are produced. In every instance where one is produced, it is found that the K note which corresponds in number with the number on such coupon, has not now attached to it any coupon numbered 5. But no one of such loose coupons numbered 5 can be regarded as belonging to any C note, because every C note has now upon it a coupon numbered 5. Therefore, whatever other conclusion you may come to, it is perfectly clear, if there was to each note one and only one coupon numbered 5, that, as each of the C·notes has upon it now a coupon numbered 5, the loose coupons numbered 5 which are now produced must have. belonged to some other notes·than the C notes. When the government produces certain notes which were issued with coupons, and produces also loose coupons found in its possession, and when, if you apply such loose coupons to the K notes, the C notes are left each with only one coupon and with four other coupons unaccounted for, it is for you to say, as bearing on the question of the genuineness of the C notes. what inference you will draw from any failure to account satisfactorily for the four coupons that are missing from the C notes. These considerations apply to the question of the genuineness of the K notes, as bearing, also, upon the question of the genuineness of the C notes.

In this connection you will recollect the testimony of Mr. Gray, who states, that, on all the K notes which have now appended to them a coupon numbered 5, he finds the positions of the seal and of the figure 5 on such coupon, relatively to each other, to be, in all cases, the same, by actual measure-ment. There is, by measurement, the same distance laterally between the figure 5 on every coupon numbered 5 that is now appended to a K note, and the projected line of the seal on such note. In regard to the C notes, Mr. Gray says, that, in the whole eighteen (each of them having appended to it a coupon numbered 5), there is, by measurement, the same distance laterally between every one of such coupons numbered 5 and the projected line of the seal on the note. But he also says, that the distance between the line of the seal and the figure 5, on the coupon numbered 5 on the K notes, is over one-quarter of an inch greater than the like distance is on the C notes. It is for you to say what conclusions you will draw from these facts. The rule of law in regard to· the application of evidence of a circumstantial character, like much of that in the present case, is this: If, in respect to a certain theory, you find any one circumstance clearly proved that is utterly inconsistent with that theory, that fact is sufficient to destroy the theory entirely. If, in respect to any point of evidence that is of a circumstantial character, you are satisfied, by proof, of the existence of any one circumstance that is entirely inconsistent with any theory advanced on either side in regard to either one of these two sets of notes, that theory must necessarily be regarded as unsound. This rule applies to every branch of the case where the evidence is circumstantial.

The government has given certain evidence, by Mr. Meloy and Mr. Irwin, in respect to the sending out from the treasury department of certain notes which it claims were the K notes, with a view to show that such notes were in fact issued by the United States. Mr. Meloy, it is claimed, wrote the receipts and letters which accompanied seven of the notes, and sent out the receipts unsigned with the notes, and received back signed the receipts which are produced. Mr. Irwin, it is claimed, sent out receipts unsigned with all the rest of the notes except one, and received back such receipts signed. The note for which there is no receipt, is, it is said, one which was sent. with others, to a person whose name is given. in exchange for other notes which had inadvertently been issued to his order. The act of issuing the notes was, under the statute, a physical act. The notes may be printed in the department, from the genuine plates, and may be all ready to issue, and yet, if they are not in fact issued, they do not come within the statute. It is for the purpose of showing the physical act of issuing the notes, that the government has given the testimony to which I have referred. The United States are not bound to redeem any notes which were not in fact issued. There is no authority to retire the notes unless they were issued, as a physical fact. In addition to the evidence alluded to, the government has also given evidence in respect to the recording

and numbering in a book, of every one of these notes, as it was issued—a book called the numerical register. It has also given evidence that no one of these notes that were issued was ever duplicated in number. Mr. Irwin states, that the whole number of seven-thirty notes of the second series, of the denomination of one thousand dollars, which was issued, was 180,272; that they were numbered consecutively from number 1 to number 180,272, both inclusive; that, as far as he knows, no duplicate number was ever issued; and that no duplicate numbers ever came back to the department except the eighty alleged counterfeits, of which the eighteen in question in this suit constitute a part. In this connection, as bearing upon the question of the genuineness of the K notes (which question, as I stated before, you may deem it proper to approach first, in the consideration of the subject), you will not lose sight of the inquiry which I put to one of the witnesses, when I asked him to examine the numbers on the K notes and see if he could discover any marks of those numbers having been tampered with, effaced, obliterated, or mutilated in any manner, and he said he could not.

I do not consider it necessary to detain you longer. It is for you to say whether any of these C notes were, in fact, passed to the government by the defendants, and paid for by the government with its money; and, if so, whether such notes were ever issued by the United States. In determining the question, as to the issuing of the C notes, a satisfactory conclusion as to whether such notes were printed from genuine plates, gotten up by the government will, undoubtedly, narrow the inquiry very much. A determination that such notes were printed from such genuine plates would lead to the conclusion, prima facie, that, if such notes got into circulation in the community, they were probably issued by the government; and thus the burden of proof would be thrown upon the government to show that they were not issued.

But, after all, the whole case comes back to the question, whether the notes marked C were ever issued by the government. Upon that question, I am requested by the counsel for the defendants to charge you, that "the burden of proving that the eighteen notes in question, marked C 1 to C 18, are not genuine obligations of the United States"—and by that must be understood obligations issued by the United States—"rests upon the plaintiffs, and, if the evidence be insufficient to establish the fact that such notes are not genuine obligations"—that is, obligations issued by the United States—"as aforesaid, the defendants are entitled to a verdict." With the alteration which I have thus made in the wording of the request, I charge you that the proposition is correct.

I am also requested by the counsel for the

defendants to charge you, that, "in determining whether the eighteen notes in question are genuine obligations, the jury are entitled to take into consideration the fact, that said notes were received as genuine by the assistant treasurer in New York, and passed through his hands, and the hands of other officials connected with the treasury department." I decline so to charge. The allegation in the declaration is, that the notes were "supposed to be genuine," by the assistant treasurer and his officers. The language of the request assumes a fact which it is not for the court to assert, that is, that the notes were "received as genuine." The averment of the declaration, that the notes were supposed to be genuine, is the extent to which the court has any right to make an assumption as a matter of fact. But, even if the notes were "received as genuine" by the assistant treasurer, that would not bind the government of the United States in any manner, if the notes were, in fact, not genuine. Nevertheless, you have the right to take into consideration the facts proved on this subject, as to the manner in which these notes were received and handled at the subtreasury, and the manipulations they underwent at Washington, upon the question as to whether the C notes are spurious or genuine, as that question may bear upon the other question, as to whether they were or were not issued by the United States. But I decline to charge, as matter of fact, that the notes "were received as genuine;" and, even if it were so, it would not be of the slightest consequence in the case. Everything that took place is undoubtedly legitimate evidence, as bearing upon the question as to whether the C notes are genuine notes, in the sense in which I have used the word "genuine"—that is, printed from the same plates from which notes issued by the United States were printed.

I am also requested by the counsel for the defendants to charge you, that, if the defendants honestly believed the notes in question to be genuine obligations issued by the United States, and, so believing, and in good faith, passed them to the assistant treasurer of the United States, and the latter, under the like belief, and in good faith, received the notes, and paid for them, the plaintiffs are not entitled to recover, although the notes may not have been genuine obligations issued by the United States. I decline so to charge.

If you shall find for the defendants, on any one of the three propositions which I have stated, your verdict will be for the defendants; that is if the government has not satisfied you that the notes came from Jay Cooke & Co., you will find for the defendants; or, if the government has not satisfied you that it paid its money for the notes to Jay Cooke & Co., you will find for the defendants; or, if you shall find that these C notes were issued by the United

States. you will find for the defendants. You must find. by a preponderance of evidence. in favor of the plaintiffs. on all three of the propositions, to entitle them to your verdict. If you shall so find, your verdict will be for $23,630.88.

The jury found a verdict for the plaintiffs, for $23,630.88.

[NOTE. Judgment being entered. the defendants brought a writ of error, and the circuit court affirmed the judgment of this court. Case No. 3,178. On error the judgment of the circuit court was reversed by the supreme court, and the cause remanded, with directions to reverse the judgment of the district court and to award a venire de novo. 91 U. S. 389.]