## Case No. 3,178.

### COOKE et al. v. UNITED STATES.

[12 Blatchf. 43; 19 Int. Rev. Rec. 181.][1]

Circuit Court, S. D. New York. May 13, 1874.[2]

REDEMPTION OF FORGED TREASURY NOTES—RECOVERY BACK BY THE UNITED STATES—ESTOPPEL—ACT OF ASSISTANT TREASURER.

1. The act of April 12th, 1866 (14 Stat. 31), authorized the secretary of the treasury to dispose of any bonds authorized by the act of March 3d, 1865 (13 Stat. 468), "for lawful money of the United States, or for any treasury notes * * * issued under any act of congress, the proceeds thereof to be used only for retiring treasury notes, or other obligations, issued under any act of congress, but nothing herein contained shall be construed to authorize any increase of the public debt." Under the act of 1865, treasury notes were issued, dated June 15th, 1865, payable June 15th, 1868. In October, 1867, the assistant treasurer of the United States, at New York, paid out money of the United States in the purchase, from J., of what purported to be some of such treasury notes, but which were afterwards pronounced, at the treasury, not to be genuine and not to have been issued by the United States. Suit was, before June 15th, 1868, brought against J., by the United States, in the district court, to recover back the money so paid, and they had a verdict and judgment. The treasury notes so issued were printed from engraved plates, with the engraved signatures of the proper officers, and were stamped with the proper seal, and were lettered and numbered by a machine, and no writing appeared on them. On a writ of error, held, if the notes were in fact wholly forged and counterfeit, the assistant treasurer had no authority to purchase them, and the plaintiffs were entitled to recover.

---

[3] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 19 Int. Rev. Rec. 181, contains only a partial report.]

[2] [Affirming Case No. 14,854. Decree of circuit court reversed by supreme court in U. S. v. Cooke, 91 U. S. 389.]

2. The government is not estopped, by the purchase and payment, from recovering back the money, not only because the government is not, in general, bound by the negligence of its officers, acting under a limited authority, but also because the defendants could, by refunding the money, be placed in the same situation as they were before the transaction.

3. The case bears no just analogy to the acceptance or payment of a forged bill of exchange by the drawee thereof, in which case the holder acts in faith of the drawee's acceptance or payment, and is disarmed of his usual recourse to prior parties. There, the drawee is estopped from setting up a state of facts which would practically operate as a fraud on the holder.

4. The decision in Bank of U. S. v. Bank of Georgia, 10 Wheat. [23 U. S.] 333, holding a bank concluded by receiving its own bank bills, which had been fraudulently altered, and crediting them as cash, seems to have depended upon the special circumstances of that case.

5. Neither that nor other cases establish, that an agent, having authority to retire genuine notes of his principal, not yet due, can conclude his principal by purchasing forged notes; still less, that the government can be concluded by such an unauthorized act of a subordinate officer.

6. There is no material difference, in this respect, between this case and any other purchase by an agent, where a mutual mistake of fact is discovered after payment of the consideration.

7. The questions, whether the government is liable on its commercial paper precisely as an individual, and whether it may be bound to pay, at maturity, treasury notes printed from genuine plates, sealed with the genuine seal, and complete in form, even though fraudulently abstracted and put into negotiation, when presented by bona fide holders for value without notice, discussed.

8. But the charge to the jury in this case was based on the proposition, that the assistant treasurer had no authority, under the act, to retire any notes, however printed, not actually issued, as a "physical fact," by the authority of the government. This construction of the act is sustained by considerations of such force, that this court deems it its duty to affirm the judgment of the court below in favor of the government.

[See note at end of case.]

[In error to the district court of the United States for the southern district of New York.

[Action by the United States against Jay Cooke, William J. Morehead, H. D. Cooke, H. C. Fahnestock, Edward Dodge, and Pitt Cooke, comprising the firm of Jay Cooke & Co., to recover back money paid them by the assistant treasurer in New York for certain counterfeits of treasury notes, in the belief that they were genuine. There was a judgment for the plaintiff in the district court (Case No. 14,854), and the defendants bring error.]

John E. Burrill, for plaintiffs in error.

Thomas Simons, Asst. Dist. Atty., for the United States.

WOODRUFF, Circuit Judge. On the 3d of March, 1865, congress authorized the secretary of the treasury to borrow, on the credit of the United States, not exceeding six hundred millions of dollars, and to issue therefor bonds or treasury notes of the United States, bearing interest not exceeding seven and three-tenths per centum per annum, payable semi-annually. 13 Stat. 468. Such notes were not made a legal tender. Under this act, treasury notes to a large amount were issued by the secretary of the treasury, payable three years after date. On the 12th of April, 1866, congress, by another act (14 Stat. 31), authorized the secretary of the treasury, at his discretion, to receive any treasury notes or other obligations issued under any act of congress, whether bearing interest or not, in exchange for any description of bonds authorized by the previous act of March 3d, 1865, and also to dispose of any description of bonds authorized by such previous act, "for lawful money of the United States, or for any treasury notes * * * which have been or which may be issued under any act of congress, the proceeds thereof to be used only for retiring treasury notes or other obligations issued under any act of congress; but nothing herein contained shall be construed to authorize any increase of the public debt."

On each of several days from and including September 20th and October 8th, 1867, the defendants, (the plaintiffs in error,) presented to the assistant treasurer of the United States, at the city of New York, large amounts of treasury notes, purporting to be issued under the act of 1865, dated June 15th, 1865, and payable three years after date, and, in the language of the then assistant treasurer, examined as a witness in this case, "he purchased the amount and description of notes at the prices and premium mentioned" in bills of sale therefor made by the defendants, (plaintiffs in error,) which, together with the notes which they purported to include, were purchased and paid for with the money of the United States, by such assistant treasurer, and at a premium above the face thereof, shown by the said bills of sale. Such bills of sale were in the following form:

Sold Hon. H. H. Van Dyck, assistant treasurer of the United States (No. 700), by Jay Cooke & Co., corner of Wall and Nassau streets, September 20,

| | | | |
|---|---|---|---|
| 400,000..June..7³/₁₀..107 | | ........ | $428,000 |
| | 97 days | ..... | 7,760 |
| 100,000..July.. " ..107 | | .......... | 107,000 |
| | 67 days | ..... | 1,340 |
| | | | $544,100 |

Upon the back of each of the treasury notes the defendants, (plaintiffs in error,) by a stamp which, for their convenience, they were permitted to employ in lieu of their written signature, before such delivery, printed the words, "Pay to the secretary of the treasury, for redemption, Jay Cooke & Co." By the form of the transaction, therefore, the defendants, (plaintiffs in error,) professed to sell the several notes, and, by endorsement, to authorize the secretary of the treas-

ury to receive them for redemption at the treasury. This appears to have been the mode which, in these cases, at least, the secretary adopted for retiring treasury notes, under the act of 1866, before mentioned. The notes thus received from the defendants were forwarded by the assistant treasurer to the secretary of the treasury at Washington, and, on examination .there, eighteen thereof, of one thousand dollars each, were pronounced not to be genuine treasury notes issued by the government of the United States, and were, therefore, returned to the assistant treasurer at New York, who, on the 13th of October, 1867, notified the defendants (plaintiffs in error) that they were counterfeit, and required them to refund the money paid for them or substitute other notes for them. The defendants below, neglecting or refusing to do either, this action was brought in the district court, on or prior to the 4th of March, 1868, to recover back the money, and, on the trial hereof, the United States had a verdict for the amount paid to the defendants below for such eighteen notes, with interest thereon,—$23,630 88. Judgment being entered, the defendants below have brought this writ of error, to review decisions made on the trial and portions of the charge of the judge to the jury (4 Ben. 376 [U. S. v. Cooke, Case No. 14,854]), which appear in the bill of exceptions made for that purpose.

The declaration herein contained special counts describing the cause of action as an indebtedness by the defendants to the plaintiffs for money had and received· by the defendants to and for the use of the United States and of their property, which money was obtained by the defendants upon occasion of their delivering to the plaintiffs what purported to be obligations of the United States, known as seven-thirty treasury notes, which were, by the defendants, when they delivered them to the officer of the sub-treasury, professed to be, and by the plaintiffs and their officer aforesaid were then supposed to be. valid genuine notes, and by the defendants' representations and inducements the same were received as valid genuine notes by the plaintiffs and their officer aforesaid, at the sub-treasury of the United States aforesaid, at the city of New York. The declaration averred, that the said notes were, in fact, counterfeit, and had never been executed or issued by the United States of America, their officers or agents, but had been forged· and falsely made and uttered, and were no obligations of the United States aforesaid, and were, by their officer aforesaid, received as aforesaid, under the belief, created by the representations and inducements aforesaid, that the notes were good and formed a valuable and adequate consideration for the money received by the defendants, which money was retained by the defendants from the plaintiffs, after discovery that the said notes were counterfeit, whereof prompt notice was given to the

defendants; and that, being so indebted, the defendants promised, &c. Other counts were also contained in the declaration, in general indebitatus assumpsit, for money had and received by the defendants to and for the use of the plaintiffs. To the declaration the defendants pleaded non assumpsit only.

The proofs on the trial were mainly addressed to the inquiries, whether the notes in question were a part of the regular series of notes printed at the treasury of the United States under the said act of 1865, and issued by the secretary of the treasury; and whether the said notes were wholly spurious and counterfeit, not made nor printed upon any plates made or engraved at the treasury; and further, whether the said notes were surreptitiously and fraudulently printed from the plates and dies in the treasury department, or, being in fact lawfully printed, were fraudulently, by some means not disclosed, put in circulation as treasury notes. On these last named questions, there was no evidence whatever of such fraudulent ·or surreptitious printing, or of such fraudulent putting in circulation of notes lawfully printed, except so far as the evidence introduced on the part of the defendants to show that these notes might have been printed from the lawfully made plates at the treasury, in connection with the evidence that the said notes were not part of the series of treasury notes lawfully issued by the secretary of the treasury, might create a suspicion that the government plates were used by some one and by some means to make the notes in question. The evidence that the notes were not printed from the government plates, but were wholly counterfeit and spurious, was very strong, and the conflict of evidence was so slight, that, had the case gone to the jury upon that sole question, it seems hardly possible that the jury could have hesitated to find them wholly false, forged, and counterfeit. Indeed, I think a finding that they were printed from the government plates, and were sealed with the genuine seal of the treasury, would have been so against the weight of the evidence, that it must have been set aside, if the jury had rendered such a verdict. But, as will be hereinafter more fully stated, the case did not go to the jury on that sole question, as the test of the right to recover, but on the question whether the notes in controversy were in fact issued by the secretary of the treasury, the question whether or not they were printed from the government plates and actually sealed with the treasury seal being regarded by the court as material only from its incidental bearing on the question whether they were in fact issued by the secretary of the treasury.

A distinction is, therefore, raised between notes which, being printed from the government plates and sealed with the seal of

the treasury, as evidence of lawful issue, were never in fact issued by the secretary of the treasury, but by some surreptitious and unlawful means may have been thrown into negotiation or circulation, and, on the other hand, notes which the secretary of the treasury actually issued from his department of the government. Notwithstanding the dearth of evidence tending to show any surreptitious or clandestine use of the government plates, or of any fraudulent abstraction of notes printed therefrom, the theory which governed the trial requires that such a possibility be contemplated in reviewing the rulings of the judge and his charge to the jury.

The case is one of great importance, not only from the amount directly involved in the recovery, but because there are believed to be a very large amount of notes which are claimed to be counterfeit, a considerable amount of like notes, retired at or about the same time, which have been pronounced counterfeit, and many suits are pending to recover back money paid by the assistant treasurer for such notes, and because, also, the questions of law involved may, in the future, affect the government and parties who hold other apparent securities purporting to be negotiable obligations of the government. The case will, as I understand, by reason of that importance, be taken to the court of last resort, and it is not, therefore, very material how the questions shall be decided in this court, through which the parties must pass on their way to the supreme court, save only that the decision here made may determine who shall be plaintiffs in error before that tribunal.

To the full understanding of the case, it may be material to bring again into distinct view the statute under which treasury notes called "seven-thirties" were issued, the manner in which such notes were prepared to be issued, and the precise terms of the statute which authorized the secretary to retire such notes before they had become payable, and to pay a premium therefor, in order to withdraw them from the market. The authority to issue such notes, given by the act of March 3d, 1865, to an amount not exceeding six hundred millions, is above firstly stated. 13 Stat. 468. It authorized the secretary of the treasury to borrow, on the credit of the United States, from time to time, in addition to the amounts theretofore authorized, any sums not exceeding in the aggregate six hundred millions of dollars, and to issue therefor bonds or treasury notes, in such form as he might prescribe. It fixed the rate of interest. It specified various purposes for which (instead of an actual loan of money) the secretary of the treasury might, as he might think advisable, dispose of such bonds or other obligations issued under the act, and gave him a discretion as to the manner, rates, and conditions of such disposition. It further applied to the bonds

and other obligations issued under it, all the provisions of the act of June 30th, 1864, in relation to forms, inscriptions, devices and the printing, attestation, sealing, signing and counterfeiting thereof. But it also expressly provided that the act should not be construed as authorizing the issue of legal tender notes in any form.

The act of June 30th, 1864 (13 Stat. 218), pro hac vice adopted by the above named act of 1865, provided, in the 6th section thereof, for the making, engraving, sealing, &c., of bonds therein referred to, and then that the treasury notes and United States notes authorized thereby "shall be in such form as the secretary of the treasury shall direct, and shall bear the written or engraved signatures of the treasurer of the United States, and the register of the treasury, and shall have printed upon them such statements, showing the amount of accrued or accruing interest, and the character of the notes, as the secretary of the treasury may prescribe, and shall bear, as a further evidence of lawful issue, the imprint of the seal of the treasury department, to be made under the direction of the secretary of the treasury, as before directed."

The material words in the act of April 12, 1866 (14 Stat. 31), under which the transactions between the defendants and the assistant treasurer at the city of New York were had, and which is above in part recited, are those which, after authorizing certain exchanges of bonds for treasury notes or other obligations issued under any act of congress, also authorized him to dispose of any of the bonds mentioned, for lawful money of the United States, "the proceeds thereof to be used only for retiring treasury notes or other obligations issued under any act of congress; but nothing herein contained shall be construed to authorize any increase of the public debt."

By virtue of the above named two acts, of 1864 and 1865, all the notes issued by the secretary of the treasury, of the description, in form and date, corresponding with those now in question, (called, for convenience, seven-thirty treasury notes,) were printed from engraved plates, with the engraved signatures of the treasurer of the United States and the register of the treasury, were lettered and numbered by a machine, and were stamped with the seal of the treasury department. No writing whatever appeared thereon, either of names, numbers or words of any kind. They were made and issued in series, each series being designated, and the notes in each series distinguished, by the numbers or letters printed thereon. Those which were produced by the plaintiffs as genuine notes which had been issued by the secretary of the treasury, and put in evidence in this case, like those sold by the defendants and subject to this controversy, were dated June 15th, 1865, payable three years after date, i. e., on the 15th of June,

1868, and were, therefore, not due at the time when the notes in question were sold by the defendants, nor when this action was brought to recover back the money paid for the said last named notes.

1. Numerous questions touching the admissibility of evidence were raised in progress of the trial. Most of them related to the question, whether the notes in question were printed from government plates in the treasury department. This inquiry was deemed proper, because, if they were so printed, then some presumption would arise that they were issued by the government. Some of them related to the proof of the notes which were in fact issued in due course, and the books and papers of the department showing to whom issued, and when, and what were their numbers, &c., as tending to show what notes, and what only, were issued by the government. Some related to other particulars. It must suffice, without taking up and discussing each exception in detail, that I am of opinion that, if the principle of liability governing the trial was correct, then no error was committed in those rulings. A large range of speculative inquiry was urged by the defendants into possible and conjectural modes of accounting for the differences between the alleged counterfeit notes and those which were testified to be genuine, and I think the defendants were allowed quite as much latitude as they were entitled to.

2. It is manifest, that, upon the merits of the controversy, the statutes and the facts above detailed suggest several interesting questions, which were raised on the trial, and were discussed in this court, on the writ of error.

(1.) The notes in question having been, in fact, purchased from the defendants by the assistant treasurer at New York, is the government concluded, or are the questions whether the notes so purchased are forged and counterfeit, and whether they were, in fact, ever issued under the acts of congress, open to inquiry and proof?

(2.) The question of fact—Are the notes in question forged and counterfeit?

(3.) If not forged and counterfeit, then the question of fact—Were they issued under any act of congress?

(4.) If not so issued in fact, are they obligations of the government which, in law, the government is bound to pay, if they were either printed from the government plates surreptitiously and unlawfully used for the purpose, or were unlawfully and surreptitiously abstracted, without any authority of the officers of the government, and were negotiated, so that they came to the hands of the defendants as bona fide holders for value, without notice?

(5.) Had the secretary of the treasury, or, more definitely, had the assistant treasurer at New York, any authority to purchase the notes in question, for the purpose of having them retired, if they were not notes which had been in fact issued by the authority of acts of congress, even though they were printed from the government plates, and came to the hands of the defendants for value paid, bona fide, and without notice, and in such wise as, upon the principles of commercial law, to create an obligation on the part of the government to pay them when they should become due?

(1.) Upon these questions, it is strenuously insisted, by the defendants, that, as the notes in question purported, on their face, to be obligations of the government, purported to be issued under and in virtue of the act of congress, purported to be treasury notes, of the description authorized by the act, and as the defendants sold them in good faith to the officer of the government, believing them to be what they purported to be, and such officer purchased and paid the defendants for them in the like belief, the plaintiffs are concluded, the inquiry whether the notes are genuine or counterfeit, and the question whether the notes were or were not, in fact, issued by due authority, is not open, and, in either event, the plaintiffs are not entitled to recover. I am not able to assent to this claim of the defendants. If the notes in question were, in fact, wholly forged and counterfeit, then they were in no sense obligations of the government, and the assistant treasurer at New York had no authority to purchase them. He acted without authority and under a mistake of facts. Even if he was negligent, the government is not to be prejudiced on that ground, where such unauthorized act wrought no prejudice to the defendants. I might, perhaps, go further and say that the government is not, in general, bound by the negligence of its officers acting under a limited authority. It is enough for this point to say, that the transaction between the defendants and the assistant treasurer has none of the features which are sometimes held to create an estoppel in pais, and so forbid a disavowal of the act. It was simply a purchase of apparently negotiable paper, not yet due, which, even if genuine, the government was not bound to pay at that time—a purchase made in the mistaken belief that the paper was genuine, and the return of which to the defendants, and reclamation of the consideration money, placed the defendants in precisely the same situation as they were before the transaction. Immediate notice of the claim to such reimbursement of the consideration being given, the defendants had every recourse to those from whom the paper was received by them that they would have had if the falsity of the paper had been detected by the assistant treasurer himself, and he had refused to buy them.

The case bears no just analogy to the acceptance of a forged bill of exchange by the drawee thereof. Such acceptance prevents

its protest. It is a direct assurance to the holder that the bill is properly drawn and will be paid, upon which he has a right to rely and does rely. It disarms him of his usual and ordinary means of direct and obvious recourse to prior parties. It immediately changes his relations to such prior parties. It thus comes plainly within the doctrine by which conduct or declarations of one made or done to influence the conduct of another, upon which such other has a right to rely and does rely, are held to constitute an estoppel in pais and conclude the former, when to permit him to contradict his conduct or declarations would place the other at a disadvantage or loss, and practically operate as a fraud upon him. Such cases are here cited and relied upon by the defendants, as, also, cases of the payment of a bill of exchange by the drawee, who, for like reasons, is held concluded thereby. This case involves no such consideration. The defendants here lost nothing either of property or security by the mistaken payment. They did nothing in faith of the transaction but receive the money, and lose nothing when they refund it. If their prior purchase of the notes gave them a right of reclamation against others, that right was unimpaired.

The case of Bank of U. S. v. Bank of Georgia, 10 Wheat. [23 U. S.] 333, is also relied upon by the defendants. There a bank received what purported to be its own circulating notes, and credited them as cash, and was held, in the circumstances of that case, concluded, so that, after the lapse of a considerable interval, having discovered that the bank bills so received were forged by fraudulent alteration, it could not use that fact as a defence to an action to recover the balance of account including such credit. Various considerations appear to have influenced the court in that decision, viz., that these were bank bills, circulating as money; that there was negligence in receiving and placing them to the credit of the plaintiff, which ought to conclude them; and that there was further laches, in the delay which allowed a considerable time to elapse before the discovery. I am, probably, not at liberty to question the correctness of the decision made by the supreme court in that case. But it is by no means clear that the supreme court would have applied the doctrine of that case to a purchase of a note or bill of exchange not yet due, and which was not a circulating medium.

These cases by no means establish that an agent, having authority to purchase the promissory notes of his principal not yet due, can conclude his principal by buying forged notes, he neither being authorized, nor professing to be authorized, to buy any but genuine notes. Still less do they establish, that the government can be estopped by such an act of its officer—an act which the government had not authorized—one which secretary of the treasury had not authorized—and where the assistant treasurer did not profess to have any authority but to buy genuine notes. I, therefore, see no material difference in this respect, between this case and any other purchase of property or supposed property under a mutual mistake of fact, where the consideration has been paid, and the thing purchased turns out not to be what it was represented and believed to be. If, therefore, this transaction was not authorized by the act of congress under which the purchase was made, there is nothing in it which operates to estop the government to prove the acts which take the transaction out of the operation of that act, whether the proof offered be that the notes are counterfeit or not within the purview of the act on other grounds. To hold otherwise, would be to say that the mere act of the agent operates to estop the principal to deny the authority of the agent to do the act.

(2.) The question of fact, whether the notes in question were forged and counterfeit, in this, that they were printed from false and fraudulent plates, prepared in imitation of the plates in the treasury, was a question for the jury, if material. If the views which governed the trial were correct, then, as already suggested, this question was only an incidental question bearing on the principal inquiry, whether the notes in question were actually issued by the secretary of the treasury or by his authority. If printed from the government plates, some presumption of fact would arise, that they were so issued, which it might be material for the government to rebut. If, on the other hand, printed from false or spurious plates, made in imitation of the plates in the treasury, then there was no evidence, and I do not understand it to be, or to have been, claimed, that they were issued by the secretary of the treasury, or constituted government obligations, in any sense whatever; and hence, if the purchase did not estop the government, the plaintiffs were entitled to recover.

(3.) If not forged and counterfeit, in the sense last above suggested, but actually printed from the same plates as the confessedly legal notes, then were these particular notes ever issued under any act of congress? This question, as a mere question of fact, viz., were they, as "a physical act" of the secretary of the treasury, issued by him, was submitted to the jury, and they have found for the plaintiffs. Such finding calls for no discussion of the question as one of mere fact. It leaves, however, the two remaining questions, as questions of law, to be adverted to.

(4.) If the notes in question were not, in fact, issued by the secretary of the treasury, or by his authority, then, did they constitute obligations which the government, as matter of law, was bound to pay when they should come to maturity, if they were actually, though surreptitiously and fraudu-

lently, printed from the government plates, dies and stamps, or, being printed, were unlawfully and fraudulently abstracted without such authority, and negotiated, so that they came to the hands of the defendants as bona fide holders for value, without notice? This question is one of an importance that can hardly be overstated. It is such to the government, which has, by act of congress, provided for the manufacture of commercial paper by means that require no other authentication than the impress of the machinery by which it is produced, and to the people in this country, and wherever the government of the United States has credit, and who accept and receive, in the ordinary course of business, such paper bearing every evidence of authenticity which the acts of congress prescribe, in affirmance of the legal validity of any of their obligations. The case is, in this respect, peculiar. The moment a note was produced, by the use of the plates, dies and stamps prepared by the secretary of the treasury, it was a completed instrument, as perfect as a note would be if it had been required to be in the handwriting of the secretary himself and to be signed by him, and he had written and signed it. The acts of congress provided for the making and issue of many hundred millions of dollars in such notes, and in small amounts adapted to the capacity of our humblest citizens whose patriotism might prompt them to lend their money thereon, or to receive them in course of negotiation, and thus aid the government in its exigency. They were negotiated, and the form and nature of the transaction show that it was the hope and intent of the acts of congress that they should be negotiated throughout the whole of our loyal territory, and in every town and village in its remotest sections. It may be asked, therefore, with great pertinency and force—Was it intended that every one who took such notes should first inquire, not alone whether they were made by printing from the government plates and stamps, and sealed with the treasury seal, and bear on their face all the genuine marks and evidence of lawful issue which the acts of congress prescribed, but, also, and further, whether the secretary, or some one authorized by him, issued them, as a "physical act?" Is such a requirement, according to legal principles, just and reasonable, to constitute the holder a bona fide holder; and, if not so issued, is there no legal obligation binding the government to their payment? It would, nevertheless, be difficult to hold, that the circumstance that the government had procured the requisite machinery, plates and stamps, was enough to bind the government to the payment of all notes which by any means were printed thereon or therewith. If such instruments, though provided for the making of valid notes, should be stolen or be fraudulently used to make such notes, it would not be true that they were negotiable paper made by government authority. Providing the means of making such paper, and so carelessly guarding it that innocent persons were deceived, by one or some who, without authority, used those means, might lay the foundation for a strong appeal to a sense of justice and equity, but the holders of paper so made would find some difficulty in sustaining the averment, at law, that the government made the notes. Be this as it may, when the government has not only prepared the instruments, but has authorized the making of the paper, and it is actually made, (printed, numbered, stamped and sealed,) bearing all the marks of genuineness prescribed by law, and is thus in existence in the keeping of the secretary of the treasury or his subordinate agents, the question may, perhaps, present a different aspect. If fraudulently or feloniously abstracted and negotiated, do the notes constitute valid legal obligations in the hands of innocent persons receiving them for value without notice? Such completed paper, in the actual possession of the secretary of the treasury, may be likened to notes complete in form and signed by an individual and locked in his desk. In the latter case, is it doubtful that, if the notes be fraudulently or feloniously abstracted from the desk, and be negotiated, so that they come to the hands of an innocent person, who gives value therefor, before maturity, without notice, the signer is bound, by the settled rules of commercial law, to pay them?

It has been said, with what I deem just accuracy, that, when the government engages in the making and negotiation of commercial paper, it submits itself to the settled rules of commercial law, and, in that respect, stands before the courts of law (whenever jurisdiction is properly obtained, as is the case when the government is plaintiff) to receive the application of those rules precisely as they would be applied to an individual.[3] If a bank issuing bills for circulation should resort to the like mode of making bills which was adopted by the government, and the names of its officers purporting to be signed to the bills actually issued by the bank were, in fact, fac similes, in lithograph, it would not be doubted that the bank was bound to redeem such bills. If such bills were fraudulently obtained from the bank vaults and put into circulation, the obligation of the bank to pay them would be no less clear. In this respect, is there any difference in the question of liability, when the paper is a negotiable note payable in the future, intended not for circulation as money,

---

[3] The Floyd Acceptances, 7 Wall. [74 U. S.] 666, 675; U. S. v. Bank of the Metropolis, 15 Pet. [40 U. S.] 392; U. S. v. Barker, 12 Wheat. [25 U. S.] 559; Delafield v. State of Illinois, 26 Wend. 192; Davis v. Gray, 16 Wall. [83 U. S.] 203, 232; Curran v. State of Arkansas, 15 How. [56 U. S.] 309, and cases there cited.

but for negotiation, in the course of business, for loans or otherwise?[4]

This question, whether, under the circumstances, on this point, above embraced in the fourth question, the notes would constitute government obligations, enforcible as such wherever jurisdiction was obtained for the purpose, was largely discussed on the argument, and its interest and importance led me into a very extended examination of the subject, and of the authorities, in England and this country, which bear upon it. But, it would not be profitable to pursue the discussion here, since the case was not made to turn, in the district court, upon this question. The final proposition upon which the case went to the jury, and upon which their verdict must be taken to have been founded, does not require the determination of the question whether, upon the facts here assumed, the government would, at the maturity of the notes, be legally bound to pay them, although not in fact issued physically by the secretary of the treasury, or by any lawful authority. The charge to the jury was, in effect, that, if not so issued, then the act of April 12th, 1866, did not authorize the secretary of the treasury to retire them, and the payment by the assistant treasurer in New York, to the defendants, of moneys of the United States, was wholly unwarranted by any legal authority, and such payment was properly repudiated.

(5.) If this instruction was correct, it disposes of the case; and this is the subject of the question above fifthly stated—Had the assistant treasurer at New York any authority to pay the money of the United States to the defendants in the purchase, for retiring, of the notes, if they were not, in fact, issued by the authority of acts of congress, even though they were printed by the agents of the government from the government plates, were duly stamped and sealed, and came to the hands of the defendants in

---

[4] Liability of individuals—Peacock v. Rhodes, 2 Doug. 633; Miller v. Race, 1 Burrows, 452; Vallett v. Parker, 6 Wend. 615; Michigan Bank v. Eldred, 9 Wall. [76 U. S.] 544; Ingham v. Primrose, 7 C. B. (N. S.) 82; Van Duzer v. Howe, 21 N. Y. 531; Young v. Grote, 4 Bing. 253; Bank of Pittsburg v. Neal, 22 How. [63 U. S.] 96. Liability of corporations for acts of their agents—Farmers' & Mechanics' Bank v. Butchers' & Drovers' Bank, 14 N. Y. 623, and 16 N. Y. 125; New York & N. H. R. Co. v. Schuyler, 34 N. Y. 30; Merchants' Bank v. State Bank, 10 Wall. [77 U. S.] 604, 645. Liability of the agents of the government—U. S. v. Macdaniel, 7 Pet. [32 U. S.] 1. Liability of municipal bodies on negotiable paper—Commissioners of Knox Co. v. Aspinwall, 21 How. [62 U. S.] 539; Same v. Wallace, Id. 546; Bissell v. City of Jeffersonville, 24 How. [65 U. S.] 287; Mercer Co. v. Hacket, 1 Wall. [68 U. S.] 83; Gelpcke v. City of Dubuque, 1 Wall. [68 U. S.] 175; Thomson v. Lee County, 3 Wall. [70 U. S.] 327; Supervisors v. Schenck, 5 Wall. [72 U. S.] 772; Lexington v. Butler, 14 Wall. [81 U. S.] 282; Lynde v. The County, 16 Wall. [83 U. S.] 6; St. Joseph v. Rogers, Id. 644. See The Floyd Acceptances, 7 Wall. [74 U. S.] 666.

such manner as, upon the principles of commercial law, to create an obligation on the part of the United States to pay them when they should become due? The answer to this question was made, and properly made, to depend upon the construction of the act of April 12th, 1866, authorizing the secretary of the treasury to retire treasury notes which were not then due. In words, that act directs the proceeds of the bonds therein mentioned "to be used only for retiring treasury notes or other obligations issued under any act of congress." The charge hereupon was: "The authority it conferred upon the secretary of the treasury and the subordinate officers of the treasury department, was solely to retire treasury notes issued under some act of congress. If they were not issued under some act of congress, they were not within the lawful powers delegated to the secretary of the treasury by the act of 1866. The entire matter is regulated by statute; and, if these notes were, in fact, not issued under an act of congress, there was no authority on the part of the secretary of the treasury, or of any other officer, high or low, not even of the president of the United States himself, to retire or redeem them." To make more plain what was meant by "issued," it was subsequently charged: "The act of issuing the notes was, under the statute, a physical act. The notes may be printed in the department from the genuine plates, and may be all ready to issue, and yet, if they are not, in fact, issued, they do not come within the statute. It is for the purpose of showing the physical act of issuing the notes, that the government has given the testimony to which I have referred. The United States are not bound to redeem any notes which were not in fact issued. There is no authority to retire the notes unless they were issued, as a physical fact." There are some remarks in the charge which may be deemed to hold that, if not so issued, the government was under no obligation to pay them when due, however printed and gotten into course of negotiation. But, the authority to retire them under the act of 1866, before maturity, was really the point in issue, and it was that which was made the test of the plaintiffs' right of recovery, as still further indicated thus: "If you find that, in point of fact, these C notes were not issued by the United States, then the plaintiffs are entitled to recover, provided," &c. * * * "The ultimate question is not whether the C notes are spurious or genuine; * * * that is a collateral question, * * * gone into as bearing on the question whether the C notes were ever issued by the United States." These instructions made the question of ultimate duty to pay the notes when due, immaterial, if the act of 1866 did not authorize the secretary of the treasury to retire them; and, as they were not due at the time this action was commenced, the ownership thereof by

the defendants constituted no defence in the nature of a set-off, if such ultimate duty to pay them were conceded.

We are, therefore, brought distinctly to the construction of the act of 1866 [14 Stat. 31]. Did it authorize the secretary of treasury to pay out the money of the United States to retire any treasury notes not actually, ("as a physical fact,") issued by the secretary of the treasury or by his authority? There is room for grave doubt of the correctness of the ruling at the trial on this point; and, not only in reference to this case, but to several others now pending, it is important that the opinion of the court of last resort should be had at as early a day as is practicable. Large amounts may depend upon the question. Time is of great importance, where witnesses are numerous and are liable to be removed by death or otherwise. I ought not to reverse and send the case back for another trial, with the necessarily incidental delays in the progress to a final determination, unless a very clear and decided conviction makes it my duty to do so.

The notes which the secretary was authorized to retire were "treasury notes, or other obligations, issued under any act of congress." It may be plausibly, at least, suggested, that the object of this statute was to change the form of the public debt, to substitute, for obligations having but a short time to run before maturity, other obligations payable at a day comparatively remote, to reduce, in short, the outstanding debt, rapidly approaching maturity; that, if such notes constituted obligations of the government, they were within the scope and meaning of the act, by whatever agency or means they were put into circulation or negotiation; that the fair and natural construction of the terms embraces whatever notes made, printed and sealed, as evidence of lawful issue, pursuant to acts of congress, were bearing interest against the government, and were then outstanding; that these terms of description are broad and comprehensive, neither suggesting, nor intended to suggest, any distinction between such notes as were issued legally or by lawful authority, and any which might have been surreptitiously and fraudulently abstracted and put into course of negotiation; that, in proper and commercial sense, any negotiable paper is "issued" by the maker, if he has made it and it has passed into negotiation, so as to bind him to pay it, whether this was effected by fraud, or otherwise without his consent; especially, that such language, applied to bank bills of a bank issuing circulating paper, would be construed so as to include, under a description "bills issued by the bank," all bills outstanding which the bank was bound to pay, even though it was known that a considerable amount or number of bills were in circulation which had been fraudulently abstracted from its vaults, and, in construing these terms of description in this statute, there is no reason for giving

to the term "issued" a more rigid or restricted meaning; that there is nothing, true in fact, or in the history of the subject, of which the court has any notice, to indicate that congress had in view any occasion for such a discrimination; that, had congress intended to discriminate between notes which were lawfully put into negotiation by the secretary of the treasury, and notes made and completely ready for negotiation, but surreptitiously or fraudulently abstracted and negotiated, the act would have stated such intent in more distinct terms, for the guidance of the officers of the government; and, finally, that there is no just reason for making such a discrimination on the one hand, while, on the other, the presumption is, that the government, having engaged in the issue of commercial paper, and being jealous of its honor and credit, would not make such a discrimination against those who, in reliance on the faith of the government, have innocently taken notes genuine, in all respects, in their preparation and authentication, and bearing every prescribed mark and indicium of lawful issue, but only distinguishable from others by a fact not appearing upon their face, viz., that they were put into negotiation without lawful authority.

It should, however, be borne in mind, that, however impressive these considerations are in their bearing on the question whether the government ought to pay such notes, they are not necessarily applicable to the gratuitous act of retiring treasury notes before they become due, or to a voluntary purchase of treasury notes. So long as such notes had not become payable, the question of ultimate liability to pay them might be postponed without injustice to any one. There was, therefore, no consideration of justice or equity towards third persons, to operate upon congress in providing, for reasons of its own, for retiring any notes which it saw fit to retire. Such considerations cannot, therefore, be properly invoked, to affect the construction of an act of congress in its nature, as to third persons, wholly gratuitous and voluntary. It was, therefore, wholly competent, and entirely equitable and just, for congress to designate, in any terms deemed appropriate, the notes to the retiring of which the "proceeds" mentioned in the act might be applied, and limit such application to those "only."

Again, it is quite obvious, that the question, whether the United States is bound to pay, in a given case, treasury notes which have not in fact been negotiated by the secretary of the treasury, or by his authority—whether, in a given case, the holder is entitled to recover, upon the rules of commercial law—may be a difficult and complicated question, depending upon proof of facts, and, often, upon the weight of testimony, which may be nicely balanced. The extended and complicated litigation in this very case may be an illustration of the uncertainty thus suggested. The question, where notes have been

surreptitiously or fraudulently abstracted, whether they are held under circumstances which make them government obligations at all, is a judicial, not an administrative, question. Facts to be ascertained and found by a jury, and rules of law to be declared by a court, are involved in the inquiry.

The theory of the charge in this case may be stated to be, that it was not the intention of the act of congress to confer upon the secretary of the treasury or his subordinate officers the exercise of judicial powers in this respect; that it was not for them to inquire into those questions of notice, bona fides, or payment of value, upon which the ultimate liability of the government to pay notes thus fraudulently abstracted from the treasury would depend. As to notes actually issued by the secretary of the treasury, no question of liability could arise. For retiring those he was authorized, at once and summarily, to use the proceeds mentioned in the act. As to any others, the holders would, at maturity, have such recourse to the government, through congress or the court of claims, as the laws will warrant, and would have such relief as might be justly due. Not only so, the investigation which might then be had, and the disclosures which, in such investigation, might be compelled, might result in enabling the government to reach the fraudulent parties, even though it should be deemed bound to pay the amounts to innocent holders. There were, therefore, reasons, and important reasons, for the discrimination in question. Congress should not be deemed to have invested the secretary of the treasury, or his subordinates, with such extraordinary, summary, judicial powers—powers which might operate to increase the public debt, if erroneously exercised, and that in the face of the express limitation in the same statute, which declares that the public debt shall not be thereby increased. The authority to retire these notes is a special statute authority, and is not to be extended by construction; and especialy so in view of the considerations above suggested. The meaning of the word "issued" is satisfied by the construction given to it in the charge. It imports an official act, not the possible legal effect of a felonious or fraudulent abstraction. For illustration of the strictly legal question, it may be supposed, that, after the preparation, in full and complete form and detail for issue, of six hundred millions of notes, or any other amount, one-half were negotiated by the secretary of the treasury, but the other half were fraudulently abstracted from his office—reasons of obvious importance to the government might suggest the propriety, not only of giving every possible description of notice and warning to put the community on their guard, but of at once retiring all that were duly issued, by substituting other obligations distinguishable therefrom. An act, simply authorizing that, should not lightly be construed to authorize, also, the retiring of

the others, if found in the hands of persons claiming to be bona fide holders for value without notice. It may be true, that, in such an act, it would be fitting and proper to declare the discrimination in clear and distinct terms; but, if the terms used were such as could be satisfied by excluding the notes so fraudulently abstracted, courts would be reluctant to hold that it intended to authorize the secretary of the treasury, or his subordinates, to sit as court and jury, to try the question, with each holder, whether he had received such paper under such circumstances that, upon the principles of commercial law, the government was liable thereon. No special circumstances of this kind are known to the court to have led to the act now under consideration; and yet, if the act is satisfied by limiting the authority of the secretary of the treasury, in the performance of this gratuitous and voluntary act, to notes which were in fact issued, it may be the duty of courts, in view of the considerations suggested, to give it that limitation.

These views are of such force and significance as to warrant my conclusion, upon the whole case, that it is my duty to affirm the judgment.

[NOTE. The rule of the commercial law, that if one accepts forged paper purporting to be his own, and pays it to a holder for value, he cannot recall the payment, is applicable as well to the United States as to individuals.

[If the notes were in fact counterfeit, their receipt by the assistant treasurer, and his payment therefor, did not preclude the United States from receiving back the money paid.

[If the notes were printed by the treasury department, and all ready for issue, yet, if they were not in fact issued, the United States could recover. The issue to bind the government must be the physical act of an authorized officer.

[The act of April 12, 1866 (14 Stat. 31), authorized the retirement of all outstanding notes of the class in question which the government would be required to meet at maturity.

[Synopsis of the opinion of the majority of the supreme court, delivered by Mr. Chief Justice Waite, reversing the circuit court decree on the writ of error brought by the defendants. Cooke v. U. S., 91 U. S. 389.]